## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN O'CONNOR, derivatively on behalf of DENTSPLY SIRONA INC., <br><br> Plaintiff, <br><br> v. <br><br> SIMON D. CAMPION, GLENN G. COLEMAN, ANDREAS G. FRANK, GREGORY T. LUCIER, WILLIE A. DEESE, BRIAN T. GLADDEN, BETSY D. HOLDEN, CLYDE R. HOSEIN, JONATHAN J. MAZELSKY, LESLIE F. VARON, JANET S. VERGIS, DOROTHEA WENZEL, ERIC K. BRANDT, HARRY M. JANSEN KRAEMER JR., and JOHN P. GROETELAARS, <br><br> Defendants, <br><br> and <br><br> DENTSPLY SIRONA INC., <br><br> Nominal Defendant. | Civil Action No. _____ <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMAND** |

Plaintiff Kevin O'Connor ("Plaintiff"), derivatively on behalf of Dentsply Sirona Inc. ("Dentsply" or the "Company"), brings the following Shareholder Derivative Complaint pursuant to New York law against the Company's board of directors (the "Board") and executive officers (together, "Director and Officer Defendants" or "Individual Defendants") for breaches of fiduciary duties. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) media reports; and (iii) pleadings filed in the federal securities class action *In re Denstply Sirona, Inc. Securities Litigation*, Case No. 1:24-cv-09083-NRB (S.D.N.Y.).

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff, a stockholder of Dentsply, on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least December 1, 2022 through November 6, 2024 (the "Relevant Period"). During that time, the Defendants (as defined herein) caused or allowed Dentsply to issue or make materially false and misleading statements concerning the Company's financial condition and business operations. Additionally, the Defendants caused or allowed Dentsply to file false and misleading statements with the SEC.

2.      Dentsply is the biggest manufacturer of professional dental products and technologies in the world, doing business in over 120 countries. Dentsply supplies dental practitioners with a large assortment of dental equipment, from high-tech imaging systems to tooth whiteners and topical fluoride.

3.      On December 31, 2020, before the Relevant Period began, Dentsply acquired Byte LLC ("Byte"), a company which sells invisible aligners and related products, for over $1 billion. In its announcement of the acquisition of Byte on January 4, 2021, Dentsply described Byte's business model as "built on doctor-directed care that provides excellent outcomes for patients with mild to moderate orthodontic needs." After the acquisition, Byte operated as a subsidiary of Dentsply.

4.      During the Relevant Period, Defendants made representations to investors that Byte was "very, very customer focused" and that Byte had "high" and "improving" customer satisfaction scores. Defendants also made representations that an "expansive nationwide network of independent licensed dentists and orthodontists" oversaw Byte customers in order to ensure compliance with dentistry rules and regulations. Finally, the Company also made representations

that a "focused funnel" of targeted potential customers led to high rates of conversion to paying customers.

5.      These representations were materially false or misleading. In reality, Byte invisible aligners had been causing major injuries to patients since at least May 2021. Also, Byte did not have a system in place to report such injuries to the Food and Drug Administration ("FDA"), despite being required to do so within 30 days of learning of them. Finally, rather than a "focused funnel" of high-quality potential customers, Byte salespeople and overseeing dentists were incentivized to enroll "contraindicated" patients who were medically ineligible for Byte treatment, inappropriately driving up conversion rates.

6.      These facts began to materialize on October 24, 2024, when Dentsply announced that it was suspending the sale and marketing of Byte Aligner Systems and Impression Kits "while the Company conducts a review of certain regulatory requirements related to these products." Dentsply further announced that it expected to record a goodwill impairment of $450 to $550 million. As a result of these disclosures, Dentsply common stock dropped $1.10 per share, or 4.5%.

7.      Then, on November 7, 2024, Dentsply adjusted its earnings per share ("EPS") outlook downwards by approximately 8%, due in part to the suspension of the sale of Byte products. The Company told investors that it was not in a position to make a decision regarding Byte but was considering discontinuing some or all of the Byte business. Dentsply also confirmed an impairment to goodwill of $495 million related to Byte. Also, Dentsply's Chief Executive Officer ("CEO"), Defendant Simon D. Campion ("Campion"), said that Byte was one of a few "significant hurdles" to achieving the Company's long-term EPS targets. These disclosures caused Dentsply common stock to drop $6.72 per share, or more than 28%.

8.    Due to Defendants' wrongful acts and omissions, and the steep decline in the market value of Dentsply common stock, the Company's market capitalization declined significantly.

9.    The Director and Officer Defendants failed to correct and/or compelled the Company to fail to correct these false and misleading statements and omissions of material fact, making them personally liable to the Company for their breach of their fiduciary duties.

10.    In addition, in breach of their fiduciary duties, the Director and Officer Defendants willfully or recklessly compelled Dentsply to fail to maintain adequate internal controls.

11.    Dentsply has been greatly damaged due to the Director and Officer Defendants' knowing or highly reckless breaches of fiduciary duty and other bad acts.

12.    The Director and Officer Defendants' bad acts have caused Dentsply, its current CEO, President, and Director Simon D. Campion, its former Chief Financial Officer ("CFO") and Executive Vice President Glenn Coleman, and its former Chief Business Officer ("CBO") and Executive Vice President Andreas G. Frank, to be named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action").

13.    Further, Dentsply must undertake internal investigations and needs to implement adequate internal controls over its financial reporting.

14.    Due to the Director and Officer Defendants' breaches of fiduciary duties, Dentsply has been and will continue to be forced to spend millions of dollars.

15.    Due to the breaches of fiduciary duty engaged in by the Director and Officer Defendants, of the collective engagement in fraud and bad acts by the Company's directors, their being beholden to one another and to various of the Director and Officer Defendants, their receipt of material personal benefits due to the Director and Officer Defendants' bad acts, the substantial

likelihood of the directors' liability in this derivative action and of Defendants Campion's, Coleman's, and Frank's liability in the Securities Class Action, and their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to begin litigation against themselves on behalf of Dentsply with the necessary level of disinterestedness and independence.

16.    Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

20.    Venue is proper in this court under 28 U.S.C. § 1391(b) because the acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District. Dentsply's common stock trades on the Nasdaq, which is headquartered in this District.

## PARTIES

### A. Plaintiff

21.     Plaintiff Kevin O'Connor is a current shareholder of Dentsply and has continuously held Dentsply stock during all times relevant hereto and is committed to retaining Dentsply shares through the pendency of this action to preserve his standing. Plaintiff will adequately and fairly represent the interests of Dentsply and its shareholders in enforcing its rights.

### B. Nominal Defendant

22.     Nominal Defendant Dentsply is a corporation organized under the laws of the State of Delaware. The Company's principal executive offices are located at 13320 Ballantyne Corporate Place, Charlotte, North Carolina 28277-3607. Dentsply's common stock trades on the Nasdaq exchange ("Nasdaq") under the ticker symbol "XRAY".

### C. Director and Officer Defendants

23.     Defendant Simon D. Campion ("Campion") has served as Dentsply's CEO, President and Director since September 2022. According to the Schedule 14A the Company filed with the SEC on April 10, 2024 (the "2024 Proxy Statement"), as of March 25, 2024, Defendant Campion owned 102,268 total shares of Dentsply common stock. Since the price per share of Dentsply common stock at the close of trading on March 25, 2024 was $32.01, Defendant Campion owned roughly $3.27 million worth of Dentsply's common stock at that time.

24.     For the fiscal year ended December 31, 2023 ("2023 Fiscal Year"), Defendant Campion received $8,518,987 in total compensation from the Company, which was composed of $1,000,000 in salary, $4,629,248 in stock awards, $1,437,346 in option awards, $1,212,500 in non-equity incentive plan compensation, and $239,893 in all other compensation.

25.     The 2024 Proxy Statement stated the following with respect to Defendant Campion:

Simon D. Campion has served as our President and Chief Executive Officer and as a member of the Company's Board of Directors since September 12, 2022. Prior to joining Dentsply Sirona, Mr. Campion served as the Executive Vice President and President of the Medical Segment of Becton, Dickinson and Company ("BD"), a position held beginning in July 2022. Prior to that, Mr. Campion served as the Executive Vice President and President of the Interventional segment for BD since September 2018 and, prior to that, he was president of the BD Surgery business unit, where he integrated legacy C. R. Bard, Inc. ("Bard") and BD product platforms into an integrated surgery offering. Mr. Campion joined Bard in 2008 and held leadership roles in numerous Bard businesses in the U.S. and Internationally. Prior to Bard, he held marketing and R&D roles at Cook Medical and Boston Scientific. Mr. Campion holds a Ph.D. in Mechanical Engineering from the University of Limerick in Ireland and a Master of Business Administration from The Open University in the United Kingdom.

**Selected Key Qualifications and Experience:**

**Large Company Experience as Executive or Board Member**
Also serving as the Chief Executive Officer of the Company, Mr. Campion possesses a wide range of business and development skills, with significant history of success in large companies.

**Medical Device or Industry Experience**
Mr. Campion has worked for over two decades in the global health care field, in various key and executive positions.

**Capital Allocation/Deployment Experience**
Mr. Campion has a deep understanding of growth and management of Company assets, and has a strong record of corporate success and development.

(Emphasis in original.)

26.    Defendant Glenn G. Coleman ("Coleman") served as Dentsply's CFO and Executive Vice President from September 2022 to November 7, 2024. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Coleman owned 66,957 total shares of Dentsply common stock. Since the price per share of Dentsply common stock at the close of trading on

March 25, 2024 was $32.01, Defendant Coleman owned roughly $2.14 million worth of Dentsply's common stock at that time.

27.     For the 2023 Fiscal Year, Defendant Coleman received $3,896,304 in total compensation from the Company, which was composed of $644,178 in salary, $2,012,684 in stock awards, $624,442 in option awards, $529,620 in non-equity incentive plan compensation, and $85,380 in all other compensation.

28.     The 2024 Proxy Statement stated the following with respect to Defendant Coleman:

> Mr. Coleman joined the company in September 2022 and he currently serves as the Company's Executive Vice President and Chief Financial Officer. Mr. Coleman previously served as the Executive Vice President and Chief Operating Officer of Integra LifeSciences Holdings Corporation from June 2019 until September 2022. From May 2014 until June 2019, Mr. Coleman acted as Integra's Corporate Vice President and Chief Financial Officer. Prior to joining Integra, Mr. Coleman spent 25 years in financial management positions with leading global businesses, including serving as vice president for finance and corporate controller at Curtiss-Wright Corporation. Mr. Coleman also worked at Alcatel Lucent in various finance executive leadership positions. Mr. Coleman began his career at PricewaterhouseCoopers LLP. Mr. Coleman received his B.S. degree from Montclair State University and has also been a CPA in New Jersey for more than 30 years.

29.     Defendant Andreas G. Frank ("Frank") served as Dentsply's Chief Business Officer ("CBO") and Executive Vice President from April 2022 to October 1, 2024. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Frank owned 116,491 total shares of Dentsply common stock. Since the price per share of Dentsply common stock at the close of trading on March 25, 2024 was $32.01, Defendant Frank owned roughly $3.73 million worth of Dentsply's common stock at that time.

30.     For the 2023 Fiscal Year, Defendant Frank received $3,746,708 in total compensation from the Company, which was composed of $721,479 in salary, $1,811,457 in stock

awards, $562,877 in option awards, $529,620 in non-equity incentive plan compensation, and $121,275 in all other compensation.

31. The 2024 Proxy Statement stated the following with respect to Defendant Frank:

> Mr. Frank joined the Company in April 2022 and currently serves as Executive Vice President, Chief Business Officer. Prior to joining Dentsply Sirona, Mr. Frank served as President, Front Line Care at Baxter International Inc since December 2021. Prior to Baxter he held the same position at Hill-Rom Holdings Inc. ("Hill-Rom"). Prior roles at Hill-Rom included Chief Transformation Officer and Senior Vice President, Corporate Development and Strategy. Prior to joining Hill-Rom, Mr. Frank served as Director of Corporate Development and Vice President, Business Development, at Danaher Corporation. He previously worked in the Corporate Finance and Strategy practice at McKinsey & Company. Mr. Frank received his master's degrees in business administration and economics from the Otto Beisheim School of Management in Germany and the University of Texas at Austin, Red McCombs School of Business, respectively, and an MBA from The University of Texas.

32. Defendant Gregory T. Lucier ("Lucier") has served as a Company director since 2019. He has been Non-Executive Chairman of the Board since January 1, 2024. He has also served as a member of the Corporate Governance and Nominating Committee since January 1, 2024. Before that, he was a member of the Human Resources Committee. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Lucier owned 52,671 total shares of Dentsply common stock. Since the price per share of Dentsply common stock at the close of trading on March 25, 2024 was $32.01, Defendant Lucier owned roughly $1.69 million worth of Dentsply's common stock at that time.

33. For the 2023 Fiscal Year, Defendant Lucier received $318,750 in total compensation from the Company, which was composed of $118,750 in fees earned or paid in cash, and $200,000 in stock awards.

34. The 2024 Proxy Statement stated the following with respect to Defendant Lucier:

Mr. Lucier was appointed Non-Executive Chairman of the Dentsply Sirona Board of Directors and as a member of the Corporate Governance and Nominating Committee effective January 1, 2024. Mr. Lucier has served as the Chief Executive Officer of Corza Health, a life sciences company, since 2018 and is an over 35 year veteran of the healthcare industry. Prior to Corza Health, Mr. Lucier was Chairman and Chief Executive Officer of NuVasive, a global technology leader in minimally invasive spine and orthopedic surgery, from 2015 to 2018. Prior to NuVasive, from 2003 to 2014, Mr. Lucier served as Chairman and CEO of Life Technologies. Mr. Lucier's early career included roles as a corporate officer of General Electric Company and as an executive at GE Medical Systems Information Technologies. He is a member of the Board of Directors of Catalent, Inc. and Maravai Lifesciences Holdings, Inc. Mr. Lucier holds a Bachelor's in Industrial Engineering from Pennsylvania State University and a Master's in Business Administration from Harvard Business School.

**Selected Key Qualifications and Experience:**

**Large Company Experience as Executive and as a Board Member**
Mr. Lucier has significant business experience, including leadership roles as an executive and board member of public companies.

**Medical Device or Industry Experience**
Mr. Lucier has held numerous leadership roles, including as Chief Executive Officer and Chairman, with a significant history of success for several medical device and life science businesses.

**Business Development Experience**
Mr. Lucier's executive leadership positions and tenure on various boards have given him general business skills, expertise and experience including in business development and corporate strategy development.

(Emphasis in original.)

35.    Defendant Willie A. Deese ("Deese") has served as a Company director since 2011. He is Chair of the Human Resources Committee. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Deese owned 64,394 total shares of Dentsply common stock. Since the price per share of Dentsply common stock at the close of trading on March 25, 2024 was

$32.01, Defendant Deese owned roughly $2.06 million worth of Dentsply's common stock at that time.

36.     For the 2023 Fiscal Year, Defendant Deese received $320,000 in total compensation from the Company, which was composed of $120,000 in fees earned or paid in cash, and $200,000 in stock awards.

37.     The 2024 Proxy Statement stated the following with respect to Defendant Deese:

> Mr. Deese retired from Merck & Co., Inc., a global pharmaceutical company, on June 1, 2016 after serving as Executive Vice President since 2008 and President of the Merck Manufacturing Division since 2005. He was also a member of Merck's Executive Committee. Mr. Deese originally joined Merck in 2004 as the company's Senior Vice President of Global Procurement. Prior to joining Merck, Mr. Deese served as Senior Vice President of Global Procurement and Logistics at GlaxoSmithKline and as Senior Vice President of Procurement at SmithKlineBeecham. He serves on the Board of Directors of the Public Service Enterprise Group, Inc. as Chair of its Corporate Governance Committee, a member of its Compensation Committee and as a member of its Audit Committee. Previously, Mr. Deese served as a member of the Board of Trustees of North Carolina A&T State University from 2007 to 2015, as the Chair of the Board of Trustees of North Carolina A&T State University from 2011 to 2013, on the Board of Directors for CDK Global Inc. as Chair of its Compensation Committee, and on the Board of Directors of G1 Therapeutics, Inc. as a member of its Audit Committee.

> **Selected Key Qualifications and Experience:**

> **Large Company Experience as Executive or Board Member**
> Mr. Deese has significant business experience, including leadership roles as an executive and board member of public companies.

> **Medical Device or Industry Experience**
> Mr. Deese's leadership roles have included executive positions in companies involved with regulated medical products.

**Manufacturing Experience**
In his role as Executive Vice President and President of the Merck Manufacturing Division, Mr. Deese was responsible for the company's global manufacturing, procurement, and distribution and logistics functions.

(Emphasis in original.)

38.    Brian T. Gladden ("Gladden") has served as a Company director since January 1, 2024. He is a member of the Audit and Finance Committee.

39.    For the 2023 Fiscal Year, Defendant Gladden received $25,000 in total compensation from the Company, which was composed solely of fees earned or paid in cash.

40.    The 2024 Proxy Statement stated the following with respect to Defendant Gladden:

Mr. Gladden is a seasoned executive with over 35 years of success in organizational development, business transformation, and setting strategic visions. He is currently the Chief Administrative and Chief Financial Officer of Zelis Healthcare Inc., a privately-held healthcare technology company. As a CFO, Mr. Gladden has led all aspects of the finance function, M&A, information technology, security, facilities, and corporate strategy. Before joining Zelis, Mr. Gladden was an Operating Partner with Bain Capital's North American Private Equity team, where he worked to create equity value across the company's portfolio of investments. Prior to Bain Capital, Mr. Gladden was CFO at public companies Mondelēz International and Dell Technologies. He began his career at General Electric, serving for nearly two decades in various senior finance and general management positions, including as President and CEO of GE Plastics and divisional CFO roles in the Plastics and Healthcare businesses. Mr. Gladden currently serves as the Chair of the Myasthenia Gravis Foundation of America and as a member of the Advisory Councils for both the Lombardo College of Business at Millersville University and the McCombs School of Business at the University of Texas – Austin. He has a Bachelor of Science in Business Administration and Finance from Millersville University.

**Selected Key Qualifications and Experience:**

**Large Company Experience as Executive or Board Member**
Mr. Gladden has significant business experience, including leadership roles as an executive.

**Capital Allocation/Deployment Experience**
Mr. Gladden has actively participated in decisions concerning investing and capital allocation in his prior and current roles.

**Business Development Experience**
Mr. Gladden's has significant experience with complex transactions, both as a former executive of large companies and in his current role.

(Emphasis in original.)

41.    Betsy D. Holden ("Holden") has served as a Company director since 2018. She is Chair of the Corporate Governance and Nominating Committee. She is also a member of the Human Resources Committee. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Holden owned 34,455 total shares of Dentsply common stock. Since the price per share of Dentsply common stock at the close of trading on March 25, 2024 was $32.01, Defendant Holden owned roughly $1.10 million worth of Dentsply's common stock at that time.

42.    For the 2023 Fiscal Year, Defendant Holden received $315,000 in total compensation from the Company, which was composed of $115,000 in fees earned or paid in cash, and $200,000 in stock awards.

43.    The 2024 Proxy Statement stated the following with respect to Defendant Holden:

Ms. Holden served as a Senior Advisor to McKinsey & Company, a global management consulting company, from April 2007 to December 2020 leading strategy, marketing, and board effectiveness initiatives for clients in consumer goods, pharma, medical products, and financial services. Prior to that, Ms. Holden spent 25 years in marketing and line positions in consumer goods. From 2001-2003, she was Co-Chief Executive Officer of Kraft Foods and from 2000-2003, she was Chief Executive Officer of Kraft Foods North America. Additional positions at Kraft included President, Global Marketing and Category Development and Executive Vice President, with oversight of operations, IT, procurement, research and development, and marketing services, as well as multiple business unit President and line management assignments. Under her leadership, Kraft was a food industry leader in sales force excellence, new product successes, marketing, and

13

digital innovation. While at Kraft, Ms. Holden led the successful acquisition and integration of Nabisco Group Holdings and the subsequent initial public offering of the company. Ms. Holden was selected as a 2015 NACD Directorship 100 honoree and was inducted into the Chicago Business Hall of Fame in 2016. Ms. Holden serves on the Food Chain Advisory Board and several portfolio company boards for Paine Schwartz Partners, a private equity firm focused on sustainable agriculture and food products. She serves on the Global Advisory Board of Northwestern University's Kellogg School of Management. She also serves on the Board of Directors for Western Union as the Chair of the Corporate Governance, ESG, and Public Policy Committee and a member of the Compensation and Benefits Committee. In addition, she serves on the Board of Directors of NNN REIT, as the Chair of its Compensation Committee and a member of its Audit Committee; and Ms. Holden also serves on the Board of Directors of Kenvue, Inc. as Chair of the Compensation and Human Capital Committee. She is the President of the Off the Street Club Board. Ms. Holden is Trustee Emeritus of Duke University where she served on the Board from 2011-2023 and the Executive Committee from 2015-2023. Ms. Holden has served on ten boards over the last 25 years including Diageo plc, Catamaran Corporation, and Time, Inc.

**Selected Key Qualifications and Experience:**

**Large Company Experience as Executive and Board Member**
Ms. Holden has served as Chief Executive Officer of a large public company and as a board member and consultant to multiple large, international, public companies.

**Experience in Marketing/Sales**
Ms. Holden has held numerous leadership roles in marketing and product management, both as an executive and in her role as a consultant, successfully implementing growth strategies, novel ideas and marketing plans to win in competitive industries.

**Business Development Experience (including M&A)**
Ms. Holden has extensive experience guiding companies through complex mergers, acquisitions and divestitures, ensuring strategic alignment and financial success.

(Emphasis in original.)

44.     Clyde R. Hosein ("Hosein") has served as a Company director since 2020. He is a member of the Audit and Finance Committee as well as a member of the Science and Technology

14

Committee. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Hosein owned 12,792 total shares of Dentsply common stock. Since the price per share of Dentsply common stock at the close of trading on March 25, 2024 was $32.01, Defendant Hosein owned roughly $409,472 worth of Dentsply's common stock at that time.

45.    For the 2023 Fiscal Year, Defendant Hosein received $300,000 in total compensation from the Company, which was composed of $100,000 in fees earned or paid in cash, and $200,000 in stock awards.

46.    The 2024 Proxy Statement stated the following with respect to Defendant Hosein:

> Mr. Hosein most recently served as Chief Financial Officer of AliveCor Inc., a medical device and AI company producing ECG hardware and software for consumer mobile devices, from March 2021 to April 2023. Prior to AliveCor, Mr. Hosein served as Chief Financial Officer of Automation Anywhere, Inc., an enterprise software provider of robotic process automation, from December 2017 to March 2021. From August 2013 to May 2017, he served as Executive Vice President and Chief Financial Officer of RingCentral, Inc., a publicly traded provider of software-as-a-service cloud-based business communications solutions. Prior to this, Mr. Hosein served from June 2008 to October 2012 as Chief Financial Officer of Marvell Technology Group Ltd., a publicly traded semiconductor provider of high-performance analog, mixed-signal, digital signal processing and embedded microprocessor integrated circuits, and he also served as its Interim Chief Operating Officer and Secretary from October 2008 to March 2010. From 2003 to 2008, he served as Vice President and Chief Financial Officer of Integrated Device Technology, Inc., a provider of mixed-signal semiconductor solutions. From 2001 to 2003, he served as Senior Vice President, Finance and Administration and Chief Financial Officer of Advanced Interconnect Technologies, a semiconductor assembly and test company. He has also held other senior level financial positions, including the role of Chief Financial Officer at Candescent Technologies, a developer of flat panel display technology. Early in his career he spent 14 years in financial and engineering roles at IBM Corporation. Mr. Hosein has been a member of the Board of Directors of Wolfspeed, Inc. (formerly Cree, Inc.) since December 2005 and a member of the Board of Directors of Credo Technology Group since April 2024.

**Selected Key Qualifications and Experience:**

**Large Company Experience as Executive or Board Member**
Mr. Hosein has significant business experience, including leadership roles as an executive and board member of an international public company.

**Understanding and Previous Work with Information Technology**
Mr. Hosein has extensive business experience with information technology and management within large global organizations.

**Financial Literacy**
In his various leadership roles, Mr. Hosein obtained extensive knowledge of accounting and financial matters.

(Emphasis in original.)

47.    Jonathan J. Mazelsky ("Mazelsky") has served as a Company director since May 24, 2023. He is a member of the Human Resources Committee as well as a member of the Science and Technology Committee. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Mazelsky owned 1,708 total shares of Dentsply common stock. Since the price per share of Dentsply common stock at the close of trading on March 25, 2024 was $32.01, Defendant Mazelsky owned roughly $54,673 worth of Dentsply's common stock at that time.

48.    For the 2023 Fiscal Year, Defendant Mazelsky received $260,440 in total compensation from the Company, which was composed of $60,440 in fees earned or paid in cash, and $200,000 in stock awards.

49.    The 2024 Proxy Statement stated the following with respect to Defendant Mazelsky:

Mr. Mazelsky has served as President and CEO of IDEXX Laboratories, Inc. since October 2019. Prior to that, Mr. Mazelsky served as Interim President and CEO of IDEXX from June 2019 to October 2019, and he was an Executive Vice President responsible for IDEXX's North American Companion Animal Group Commercial Organization and key elements of the innovation

portfolio, including IDEXX VetLab® in-house diagnostics, Diagnostic Imaging, Veterinary Software and Services, and the Rapid Assay and Telemedicine lines of business, from August 2012 to June 2019. Before joining IDEXX, Mr. Mazelsky was a Senior Vice President and General Manager from 2010 to 2012 of Computed Tomography, Nuclear Medicine and Radiation Therapy Planning at Philips Healthcare, a subsidiary of Royal Philips Electronics (now named Royal Philips). Previously he held a series of other leadership roles with increasing responsibilities during his tenure at Philips beginning in 2001. Prior to joining Philips, Mr. Mazelsky was at Agilent Technologies, where he was an Executive in Charge from 2000 to 2002, leading the integration of Agilent's Healthcare Group into Philips. He also served as a General Manager of the Medical Consumables Business Unit at Agilent Technologies from 1997 to 2000. From 1988 to 1996, Mr. Mazelsky held a number of roles at Hewlett Packard in finance, marketing and business planning. Mr. Mazelsky holds an undergraduate degree in Mathematics from the University of Rochester and an MBA from the University of Chicago.

**Selected Key Qualifications and Experience:**

**Large Company Experience as an Executive**
Mr. Mazelsky has an extensive history of successfully leading large global companies and businesses throughout his career.

**Medical Device or Industry Experience**
Mr. Mazelsky has several decades of experience leading global enterprises in healthcare markets.

**International Business Experience**
Mr. Mazelsky's tenure in international business leadership positions provides significant experience and expertise to the Board of Directors.

(Emphasis in original.)

50.     Leslie F. Varon ("Varon") has served as a Company director since 2018. She is Chair of the Audit and Finance Committee. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Varon owned 30,340 total shares of Dentsply common stock. Since the price per share of Dentsply common stock at the close of trading on March 25, 2024 was $32.01, Defendant Varon owned roughly $971,183 worth of Dentsply's common stock at that time.

51.     For the 2023 Fiscal Year, Defendant Varon received $325,000 in total compensation from the Company, which was composed of $125,000 in fees earned or paid in cash, and $200,000 in stock awards.

52.     The 2024 Proxy Statement stated the following with respect to Defendant Varon:

> Ms. Varon served as Chief Financial Officer of Xerox Corporation, a document solutions company, from November 2015 through December 2016, during which time she led the restructuring of the $18 billion business process services, printing equipment, software and solutions company, including the successful spin-off of its $7 billion services business. After that transaction, she became Special Advisor to the new Xerox Chief Executive Officer until March 2017 when she retired from the company. Prior to becoming Chief Financial Officer at Xerox, she was briefly VP Investor Relations from March 2015 through October 2015. Previously she served Xerox as VP Finance & Corporate Controller from July 2006 to February 2015, where she oversaw global financial operating executives and had responsibility for corporate financial planning and analysis, accounting, internal audit, risk management, global real estate and worldwide shared services centers. Earlier in her career, Ms. Varon was Vice President Finance & Operations support for Xerox's North American business, Vice President Xerox Investor Relations and Corporate Secretary and Director of Corporate Audit. From 2006 to 2017 she served on the board of Xerox International Partners, a joint venture between Xerox Corporation and Fuji Xerox Corporation, representing Xerox Corporation's ownership stake. Ms. Varon serves on the Board of Directors for Hamilton Lane Inc. and LAM Research Corporation.
>
> **Selected Key Qualifications and Experience:**
>
> **Large Company Experience as Executive or Board Member**
> Ms. Varon has significant business experience, including leadership roles as an executive.
>
> **Capital Allocation/Deployment Experience**
> Ms. Varon has a substantial record of financial experience and proper maintenance of a large corporation, including as a Chief Financial Officer.

>**Business Development Experience**
>Ms. Varon has an extensive history working with large transactions
>and business transformation in a public company, and has a deep
>understanding of business deals and growth.

(Emphasis in original.)

53.    Janet S. Vergis ("Vergis") has served as a Company director since 2019. She is
Chair of the Science and Technology Committee. She is also a member of the Human Resources
Committee. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Vergis
owned 16,347 total shares of Dentsply common stock. Since the price per share of Dentsply
common stock at the close of trading on March 25, 2024 was $32.01, Defendant Vergis owned
roughly $523,267 worth of Dentsply's common stock at that time.

54.    For the 2023 Fiscal Year, Defendant Vergis received $315,000 in total
compensation from the Company, which was composed of $115,000 in fees earned or paid in cash,
and $200,000 in stock awards.

55.    The 2024 Proxy Statement stated the following with respect to Defendant Vergis:

>Ms. Vergis has over 35 years of experience in the healthcare industry
>and recently served as an executive advisor to private equity firms
>from 2013 to 2019. Prior to her advisory role she was the Chief
>Executive Officer of OraPharma,lnc., a privately held, specialty
>pharmaceutical company focusing on oral health. In that role she led
>the turnaround of the business and its subsequent successful sale.
>Preceding her role at OraPharma, Ms. Vergis managed a multi-
>billion portfolio at Johnson & Johnson as President of Janssen
>Pharmaceuticals,    McNeil    Pediatrics,    and    Ortho-McNeil
>Neurologics. Ms. Vergis contributed to several Johnson & Johnson
>companies during her career, serving as a member of company
>management boards for over 10 years and holding positions of
>increasing responsibility in research and development, new product
>development, sales, and marketing. Ms. Vergis serves on the Board
>of Directors for Church and Dwight Co., Inc., Teva Pharmaceutical
>Industries Ltd., and SGS SA. She previously served on the Board of
>Directors of Amneal Pharmaceuticals, Inc. She is also Chair of The
>Biotechnology Advisory Board and Vice-Chair of the Corporate and
>Foundation Relations Advisory Board at Penn State. Ms. Vergis

earned a B.S. degree in Biology and an M.S. degree in Physiology
from The Pennsylvania State University.

**Selected Key Qualifications and Experience:**

**Large Company Experience as Executive or Board Member**
Ms. Vergis has significant business experience, including leadership
roles as an executive.

**Medical Device or Industry Experience**
Ms. Vergis has worked for over three decades in the global
healthcare field, including in various key advisory and executive
positions.

**Capital Allocation/Deployment Experience**
Ms. Vergis has a substantial record of financial experience and
proper maintenance of a large corporation, including an extensive
history working with large transactions and business
transformations.

(Emphasis in original.)

56.    Dorothea Wenzel ("Wenzel") served as a Company director from 2022 until

February 5, 2025. She was a member of the Audit and Finance Committee. According to the 2024

Proxy Statement, as of March 25, 2024, Defendant Wenzel owned 4,535 total shares of Dentsply

common stock. Since the price per share of Dentsply common stock at the close of trading on

March 25, 2024 was $32.01, Defendant Wenzel owned roughly $145,165 worth of Dentsply's

common stock at that time.

57.    For the 2023 Fiscal Year, Defendant Wenzel received $310,556 in total

compensation from the Company, which was composed of $110,000 in fees earned or paid in cash,

and $200,000 in stock awards.

58.    The 2024 Proxy Statement stated the following with respect to Defendant Wenzel:

Dr. Dorothea Wenzel served for Merck KGaA, Darmstadt,
Germany, from June 2004 to August 2021, most recently since 2019
as Executive Vice President and Head of the Surface Solutions
Business Unit. At Merck, KGaA, Darmstadt, Germany, she further

held various Senior Management Positions in the Health Care Division of the DAX-listed company. Prior to joining Merck, Dr. Wenzel held a number of finance and business positions in the health care industry at AXA Krankenversicherung AG and Medvantis Holding AG and worked for several years as consultant and engagement manager at McKinsey & Co. Dr. Wenzel was also a Member of the Staff of the Committee for the Sustainability of the Financing of the Social Security Systems of the Federal Ministry of Health (Germany). She holds a doctorate in Health Economics and a diploma in business & computer sciences from the Technical University of Darmstadt. Dr. Dorothea Wenzel is an independent director on the board of H. Lundbeck A/S and an independent director on the board of Servier SAS.

**Selected Key Qualifications and Experience:**

**Large Company Experience as Executive or Board Member**
Dr. Wenzel has significant business experience, including leadership roles as an executive.

**Medical Device or Industry Experience**
Dr. Wenzel has worked for over three decades in the global healthcare field, including in various key advisory and executive positions.

**Capital Allocation/Deployment Experience**
Dr. Wenzel has a deep understanding of growth and management of Company assets, and has a strong record of corporate success and development.

(Emphasis in original.)

59.     Eric K. Brandt ("Brandt") served as a Company director from 2004 until May 22, 2024. Mr. Brandt served as Non-Executive Chairman of the Board from September 28, 2017 through December 31, 2023. He was also a member of the Corporate Governance and Nominating Committee. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Brandt owned 90,016 total shares of Dentsply common stock. Since the price per share of Dentsply common stock at the close of trading on March 25, 2024 was $32.01, Defendant Brandt owned roughly $2.88 million worth of Dentsply's common stock at that time.

60.     For the 2023 Fiscal Year, Defendant Brandt received $456,250 in total compensation from the Company, which was composed of $156,250 in fees earned or paid in cash, and $300,000 in stock awards.

61.     Harry M. Jansen Kraemer Jr. ("Kraemer") served as a Company director from 2004 until December 31, 2023. He was a member of the Corporate Governance and Nominating Committee. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Kraemer owned 167,234 total shares of Dentsply common stock. Since the price per share of Dentsply common stock at the close of trading on March 25, 2024 was $32.01, Defendant Kraemer owned roughly $5.35 million worth of Dentsply's common stock at that time.

62.     For the 2023 Fiscal Year, Defendant Kraemer received $300,000 in total compensation from the Company, which was composed of $100,000 in fees earned or paid in cash, and $200,000 in stock awards.

63.     John P. Groetelaars ("Groetelaars") served as a Company director from April 2022 until May 24, 2023. He was a member of the Science and Technology Committee.

64.     For the 2023 Fiscal Year, Defendant Groetelaars received $25,000 in total compensation from the Company, which was composed solely of fees earned or paid in cash.

**FIDUCIARY DUTIES OF THE DIRECTOR AND OFFICER DEFENDANTS**

65.     By virtue of their positions as officers and/or directors and/or fiduciaries of Dentsply and due to their ability to control the business and corporate affairs of Dentsply, the Director and Officer Defendants owed Dentsply and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are mandated to use their full ability to control and manage Dentsply in a fair, just, honest, and equitable way. The Director and Officer Defendants were and are mandated to act in furtherance of the best interests of Dentsply and its stockholders

in order to enhance all stockholders equally.

66.    Each director and officer of the Company owes to Dentsply and its stockholders the fiduciary duty to exercise good faith and diligence in the management of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67.    The Director and Officer Defendants, by virtue of their positions of control and authority as directors and/or officers of Dentsply, could and did, directly and/or indirectly, exercise control over the unlawful acts complained of herein.

68.    To carry out their duties, the officers and directors of Dentsply had to exercise reasonable and careful supervision over the management, policies, controls, and operations of the Company.

69.    Each Individual Defendant, because of their position as a director and/or officer, owed to the Company and to its stockholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The behavior of the Director and Officer Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Dentsply, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders that the Director and Officer Defendants were aware or should have been aware posed a risk of serious injury to the Company. The behavior of the Director and Officer Defendants who were also officers and directors of the Company has been ratified by the remaining Director and Officer Defendants who collectively made up the Company's Board at all relevant times.

70.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the

Nasdaq, the Director and Officer Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information regarding the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to compel the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of Dentsply common stock would be based upon truthful and accurate information. Further, they had a duty to insure the Company complied with all applicable laws.

71. To carry out their duties, the officers and directors of the Company had to exercise reasonable and careful supervision over the management, policies, practices, and internal controls of the Company. Because of such duties, the officers and directors of Dentsply had to, among other things:

(a) insure that the Company was operated in a diligent, honest, and careful manner in accordance with the laws and regulations of New York and the United States, and pursuant to Dentsply's corporate governance and applicable codes of conduct and/or ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner in order to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Dentsply conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Dentsply and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or compel independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Dentsply's operations would comply with all applicable laws and Dentsply's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's stockholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was mandated by law to disseminate;

(g) refrain from unduly enhancing themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information regarding the financial affairs of the Company and make full and accurate disclosure of all material facts regarding, *inter alia*, each of the subjects and duties set forth *supra*.

72. Each Individual Defendant further owed to Dentsply and the stockholders the duty of loyalty requiring that each favor Dentsply's interest and that of its stockholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

73. At all times relevant hereto, the Director and Officer Defendants were the agents of each other and of Dentsply and were at all times acting within the course and scope of such agency.

74.     Due to their advisory, executive, managerial, directorial, and controlling shareholder positions with Dentsply, each Individual Defendant had access to adverse, nonpublic information about the Company.

75.     The Director and Officer Defendants, by virtue of their positions of control and authority, could and did, directly or indirectly, exercise control over the unlawful acts complained of herein, as well as the contents of the various public statements issued by Dentsply.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.     In committing the unlawful acts alleged herein, the Director and Officer Defendants have pursued, or joined in the pursuit of, a common course of behavior, and have acted in concert with and conspired with one another in furtherance of their bad acts. The Director and Officer Defendants compelled the Company to hide the true facts as alleged herein. The Director and Officer Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77.     The goal and effect of the conspiracy, scheme, and/or common course of behavior was, *inter alia*, to: (i) facilitate and disguise the Director and Officer Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) hide adverse information regarding the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

78.     The Director and Officer Defendants accomplished their conspiracy, scheme, and/or common course of behavior by compelling the Company purposefully or recklessly to hide material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this scheme, conspiracy, and course of behavior, the Director and Officer Defendants

individually and collectively took the actions set forth herein. Because the actions described herein

occurred under the authority of the Board, each Individual Defendant who is or was a director of

Dentsply was a direct, necessary, and substantial participant in the conspiracy, scheme, and/or

common course of behavior complained of herein.

79.    Each Individual Defendant aided and abetted and rendered substantial assistance in

the wrongs complained of herein. In taking such actions to substantially assist the commission of

the bad acts complained of herein, each Individual Defendant acted with actual or constructive

knowledge of the primary bad acts, either took direct part in, or substantially assisted in the

accomplishment of those bad acts, and was or should have been aware of his or her overall

contribution to and furtherance of the bad acts.

80.    At all times relevant hereto, each Individual Defendant was the agent of each of the

other Director and Officer Defendants and of Dentsply and was at all times acting within the course

and scope of such agency.

**DENTSPLY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

***Dentsply's Code of Ethics & Business Conduct***

81.    Dentsply's Code of Ethics & Business Conduct (the "Code of Conduct") states, in

part:

> Dentsply Sirona has a renewed sense of commitment to an
> unwavering focus on performance with integrity. As we continue to
> grow, we rely on the integrity of every employee, **board member**
> and business partner to guide their actions. However, it is not enough
> to just act with integrity, we must hold each other accountable and
> be willing to speak up if we see something that does not align with
> our values and operating principles. **We must be honest in our
> communication - transparent in our intentions and forthcoming
> with all information that will help the company make good
> decisions and operate in a compliant manner.**
>
> .

.
.

Dentsply Sirona must earn the trust of our customers and investors every day, through the actions of our employees.

.
.
.

We ask that all members of the Dentsply Sirona community – employees, **officers, directors** and business partners - comply not only with these policies, but also use good judgment and integrity in all situations that may not be specifically addressed in the Dentsply Sirona Code. Ultimately, the spirit and intent of Dentsply Sirona's Core Values and operating principles, and the Dentsply Sirona Code should guide your actions.

As members of the Dentsply Sirona community, we are accountable to one another. Should you ever have questions or concerns about the policies outlined in the Dentsply Sirona Code or the integrity of others' actions, please alert your manager, your local compliance leader, the Chief Compliance Officer, or use one of the many other channels the Company makes available to you including the Ethics Hotline. **Do not allow anything – such as "making the numbers,"** competitive instincts, or even a direct order from a superior – **to compromise your commitment to unquestionable integrity.**

.
.
.

**Excellent financial performance and high standards of governance and compliance are equally important and valuable.** As we continually improve upon Dentsply Sirona's business, we must recognize that only one kind of performance will maintain our strong reputation, increase our customers' confidence in our products and services, and enable us to continue to grow; that is performance with integrity.

(Emphasis added.)

82.     Under the heading "Conflict of Interest," the Code of Conduct states, in relevant part, that:

28

Conflicts of interest arise when activities or interests of an employee call into question his/her actions or judgement and objectivity in their professional capacity at Dentsply Sirona. On the job or in your free time, nothing you do should conflict with your responsibilities to Dentsply Sirona.

83.    Under the heading "What Leaders Must Do," the Code of Conduct states, in relevant part, that:

Ethical business practices and compliance with all applicable laws is everyone's responsibility. It starts with our values and must be reflected in all of our actions. **The tone from the top is important in creating a foundation for a culture of integrity** but then leaders at all levels must live those values and demonstrate unwavering integrity in everything we do.

As a leader, you must act to cultivate this culture of compliance in your respective organizations and assure that your employees understand their responsibilities and feel comfortable raising concerns without fear of retaliation. This means encouraging ethical conduct and compliance with the law by personally demonstrating and promoting Dentsply Sirona's Core Values, considering compliance efforts when evaluating and rewarding employees, and ensuring that employees understand that business results must be achieved while complying with Dentsply Sirona policies and all applicable laws.

It is the responsibility of our pillar leadership … at all levels to assure that the various polices and processes which constitute the Dentsply Sirona Ethics and Compliance program are fully and effectively administered in their respective areas of responsibility. The Ethics and Compliance department is always available to answer questions and provide guidance to our global businesses.

All managers must take the following steps to build an infrastructure to prevent, detect and respond to compliance issues:

• Ensure that policies and processes, tailored to address your particular risk areas, are communicated and implemented.

• Ensure that all employees receive education on Dentsply Sirona policies and applicable law.

• Commit adequate resources to your business efforts toward implementing the compliance program.

• Include ethics and compliance topics in your staff meetings and townhalls. The Compliance staff should not be the only leaders talking about ethics and compliance.

**• Implement control measures, such as appropriate financial controls to identify and prevent fraud and other violations.**

• Promote Dentsply Sirona's Core Values and Operating Principles and the Dentsply Sirona Code of Ethics and Business Conduct.

• Support and encourage periodic compliance reviews with the assistance of the Chief Compliance Officer or your regional Compliance Leader, and/or the Corporate Internal Audit Services staff.

• Encourage employees to speak up and report integrity or compliance issues.

• Promptly implement corrective action to fix identified compliance weaknesses.

• Report any legal and ethics issues to the Legal department and/or Chief Compliance Officer.

**In addition, the Chief Executive Officer (CEO), Chief Financial Officer (CFO), and Chief Accounting Officer (CAO) or persons performing similar functions, are subject to the following additional specific requirements:**

• Maintain high standards of honest and ethical conduct and avoid any actual or apparent conflict of interest;

• report to the Audit and Finance Committee of the Board of Directors any conflict of interest that may arise and any material transaction or relationship that reasonably could be expected to give rise to a conflict;

**• provide, or cause to be provided, full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public communications;**

**• comply and take all reasonable actions to cause others to comply with applicable governmental laws, rules, and regulations; and**

**• promptly report violations of the Code of Ethics for the CEO, CFO, and CAO to the Audit and Finance Committee either through the DS Ethics Hotline or directly to the chair of the Audit and Finance Committee.**

**• the Audit and Finance Committee will in-turn assess compliance with this Code of Ethics for material violations to the Board of Directors, and recommend to the Board appropriate action.**

(Emphasis added.)

84.    Under the heading "Fraud," the Code of Conduct states, in relevant part, that:

Fraud is perpetrated by individuals or in concert with others to obtain money, property, or services; to avoid payment or loss of services; or to secure personal or business advantage. The majority of fraudulent acts are some form of asset misappropriation or the manipulation of the system to artificially alter financial results. The cumulative effect of repeated incidents of asset misappropriation may have significant financial impact on a business and may result in the need for financial restatement or SEC reporting for a U.S., publicly traded company such as Dentsply Sirona.

Dentsply Sirona has ambitious goals to grow our business and improve our operating margin. Though delivering financial results and achieving goals is important, **this will never be done by compromising our values and operating principles.**

The following is not an exhaustive list of asset misappropriation schemes but provides an idea of the things we need to focus on to mitigate the risk to our company:

.
.
.

• Misrepresentation of information on documents;

• Misappropriation of funds, supplies, or assets and embezzlement;

.
.
.

• Improprieties in the handling or reporting of money or financial transactions;

.
.
.

• Not disclosing pertinent information during an audit or investigation just because the question was not asked.

.
.
.

• Exploiting weak controls

.
.
.

Dentsply Sirona recognizes the risk that fraud of any type represents to the company and our shareholders and takes the appropriate steps to prevent fraud before it occurs, detect fraud which may be occurring and thoroughly investigates suspected fraud. If and when fraud is discovered, Dentsply Sirona responds swiftly and aggressively to identify the person or persons responsible, assures that the schemes are fully understood and terminated, recover the misappropriated funds and will work with local and U.S. federal agencies in legal prosecution of the responsible individuals.

(Emphasis in original.)

85.    In violation of the Code of Conduct, the Director and Officer Defendants (as key officers and members of the Company's Board) compelled the Company to issue materially false and misleading statements to the public, facilitated and disguised the Individual Defendant's violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and aiding and abetting thereof. Also, in violation of the Code of Conduct, the Director and Officer Defendants failed to comply with laws and

regulations and conduct business in an honest and ethical manner, and properly report violations

of the Code of Conduct.

### *Dentsply's Audit and Finance Committee Charter*

86.     The Audit and Finance Committee Charter states that the purpose of the Audit and

Finance Committee is as follows:

> The purpose of the Audit and Finance Committee (the "Committee")
> is to assist the Board of Directors (the "Board") of DENTSPLY
> SIRONA Inc. (the "Company") in its oversight responsibilities
> related to corporate accounting and financial reporting disclosures,
> systems of internal accounting and financial controls of the
> Company and the audit of the Company's financial statements, the
> implementation and effectiveness of the Company's disclosure
> controls and procedures, corporate financing activities, treasury
> activities, information technology and cyber security activities,
> internal audit activities, risk management activities relating to
> financial and other matters, including corruption and bribery laws
> (e.g., the FCPA and the UK Bribery Act), and the Company's
> process for monitoring compliance with laws and regulations and
> the Company's Code of Business Conduct and Ethics. The
> Committee shall also prepare the report of the Committee required
> to be included in the Company's annual proxy statement. It shall be
> the policy of the Committee to maintain free and open
> communication between the Board, the registered public accounting
> firm engaged for the purpose of preparing or issuing an audit report
> for inclusion in the Company's annual report on Form 10-K or for
> performing other audit, review or attest services for the Company
> (referred to herein as the "independent accountants"), the internal
> auditors and the management of the Company.

87.     Under the section titled "Financial Oversight and Reporting," the Audit and Finance

Committee Charter states, in relevant part:

> The Committee shall have the role and responsibility for monitoring
> and overseeing the management, gathering and reporting of
> financial data and information, which shall include the following:
>
> 1. **To have the sole authority to select, retain and terminate the
>    Company's independent accountants**, including approval of
>    an engagement letter. The Committee shall consider the most
>    recent vote of the Company's stockholders with respect to the

retention of independent public accountants, provided that such vote shall not be binding and the Committee shall retain full discretion and authority with respect to the selection, retention and termination of the Company's independent accountants. The Committee shall be directly responsible for the compensation and oversight of the work of the independent accountants (including resolution of disagreements between management and the independent accountants regarding financial reporting) for the purpose of preparing or issuing an audit report or related work. The independent accountants shall report directly to the Committee.

.
.
.

2. To review and discuss with management, internal audit and the independent accountants, in separate meetings if the Committee deems it appropriate:

(a) the annual audited financial statements, related footnotes and other financial information to be included in the Company's Form 10-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), prior to the filing of the Form 10-K and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K;

(b) the quarterly financial statements, related footnotes and other financial information to be included in the Company's Form 10-Q, including the Company's disclosures under MD&A, prior to the filing of the Company's Form 10-Q;

(c) any major issues regarding significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes to the Company's internal control over financial reporting or to the Company's selection or application of accounting principles and major issues as to the adequacy of the Company's internal control over financial reporting and any special audit steps adopted in light of material control deficiencies;

(d) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and

judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

(e) the effect of regulatory and accounting initiatives on the Company's financial statements as well as off-balance sheet structures, if any;

(f) disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K or Form 10-Q regarding any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting;

(g) significant, complex or unusual transactions and their impact on the financial statements;

(h) any material communications between the Company and the SEC, particularly those relating to financial reporting matters; and

(i) risk of fraud (regardless of materiality) and the implementation and existence of fraud control.

(Emphasis added.)

88.    In violation of the Audit and Finance Committee Charter, the Director and Officer Defendants comprising the Audit and Finance Committee (as key officers and members of the Company's Board) compelled the Company to issue materially false and misleading statements to the public, facilitated and disguised the Director and Officer Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and aiding and abetting thereof. Also, in violation of the Audit and Finance Committee Charter, the Director and Officer Defendants failed to implement risk assessment and risk management protocol and failed to insure the Company's compliance with applicable law.

## DIRECTOR AND OFFICER DEFENDANTS' MISCONDUCT

### Background

89.    Dentsply is a manufacturer of professional dental products and technologies. It makes a myriad of dental supplies, from anesthetics, plaque and gum disease prevention, to tooth polishers, and artificial teeth. On December 31, 2020, Dentsply acquired the company Byte and its parent company, Straight Smile, LLC for over $1 billion in cash. In a press release announcing the acquisition, Dentsply touted Byte as a "leading direct-to-consumer, doctor-directed clear aligner company." Clear aligners are orthodontic devices similar to braces, made of see-through plastic.

90.    The business model of Byte was to first send a potential customer an impression kit, which allowed customers to take mold impressions of their teeth at home. After the customer sent the impression back to Byte, Byte would analyze it. Based on these impressions, Byte created a treatment plan and made and delivered several clear aligners which the customer would wear to gradually move that customer's teeth towards the desired result. While most traditional clear aligners like Invisalign or Dentsply's comparable product, SureSmile, involve patients going to a dentist's office for an initial exam and regular monitoring, Byte did not require these types of visits. Instead, Byte averred that its treatment planning was overseen "by [a] network of licensed dentists and orthodontists." This benefit was valued by some customers, as was the price, which was much lower than comparable in-office treatments. Because of this, Byte served "a patient population historically prohibited proper oral care due to high costs."

### Materially False and Misleading Statements Issued During the Class Period

91.    The Relevant Period begins on December 1, 2022. On that day, during the Evercore ISI HealthCONx Conference, CEO Campion praised Byte, stating, "[W]e think that Byte can be

an integral and important part of our portfolio moving forward. . . . [A]s we move into 2023, it is a key focus for management and the team that runs Byte and SureSmile to ensure we get more value out of that particular part of our business."

92.    During the same conference, CFO Coleman added, "I think we've seen really strong sequential growth in different parts of our aligner business both Byte and SureSmile year-over-year. . . . I think the key for us, though, is -- the revenue opportunity is clearly there. . . . But Simon's point, is it an underpenetrated market, probably the fastest-growing area of dental as we know. And so our intent is to continue to be a key player here."

93.    On January 11, 2023, a number of Dentsply executives attended the JP Morgan Healthcare Conference. At the conference, Defendant Frank talked about "patient compliance and patient experience," saying "our new Byte app [ ] drives significantly closer engagement with the patients throughout their treatment, leads to higher compliance, leads to higher net promoter scores that we can track and measure as one of our KPIs."

94.    On February 28, 2023, Dentsply conducted an earnings call with investors and analysts to talk about the Company's financial results for the fourth quarter of 2022. During this earnings call, Defendant Coleman averred that "despite slowing consumer spending trends," Byte had strong growth due to "improvement in customer conversion rates." Defendant Campion said that Byte was "a meaningful part of our portfolio" and that Dentsply was concentrating on "driving customer acquisition, customer conversion and trying to increase customer satisfaction scores."

95.    On March 1, 2023, Dentsply filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2022. In the 10-K, the Company once again said that Byte "contracts with an expansive nationwide network of independent licensed dentists and orthodontists for the provision of clinical services, including the oversight and control of each

37

customer's clinical treatment in order to comply with these regulations and ensure that the business does not violate rules pertaining to the corporate practice of dentistry."

96.     Dentsply conducted its earnings call for the first quarter of 2023 on May 3, 2023. On this call, Defendant Coleman averred that "higher customer conversion rates" were driving "strong growth" for Byte, "despite slowing consumer spending trends." Coleman added, "the most important thing is really looking at the quality of the funnel and how we're targeting customers. And we're seeing an increase in our overall customer conversion rates, which really helped to reduce customer acquisition costs and drive increased profitability." He went on to say, "I think we're doing a much better job of targeting customers and driving better customer conversion rates." On this call, Defendant Campion also said that "we have been passing or rolling through an improved process at Byte in relation to customer acquisition, ensuring that the customers that we are bringing into the funnel are more likely than in the past to end up ordering aligners."

97.     On May 10, 2023, Defendant Campion attended a question-and-answer session with a Bank of America analyst during the Bank of America Securities Healthcare Conference. At this session, Campion said that Byte had a "really strong quarter, low 30% growth rate for Byte. Great conversion rate." He also averred that the Byte "funnel is smaller but it's a higher quality funnel, as a result of the ton of the work that the team in Salt Lake City has done. So our conversion rates have gone up." Campion further said that "the Byte Plus app has increased our net promoter score meaningfully over the past six months."

98.     On June 1, 2023, Dentsply executives came back to Stifel's Jaws & Paws Conference, where Campion averred that Byte had "streamlined how we how we run that business in the sense of we have a more focused funnel." He added, "We validate customers as they enter

the funnel. So we don't spend money sending an impression kit to a customer who is not likely to actually purchase. We've changed incentive plans."

99.     On August 3, 2023, Dentsply conducted its earnings call with analysts and investors to talk about the Company's financial results for the second quarter of 2023. On the call, Defendant Coleman said that "Byte grew high-single digits, driven by improved customer conversion rates and lower customer acquisition costs." Campion added: "Byte continues to deliver top line growth and enhanced operational performance with higher customer conversion rates, effective patient engagement and lower customer acquisition costs."

100.    On November 9, 2023, Dentsply held a virtual "Investor Day" for analysts and investors. On this conference call, Campion averred that Dentsply was "investing in the patient experience with our SureSmile and Byte aligners." Frank said that the "Byte business has changed its marketing strategy to focus on specific target demographics, which has resulted in more than 20% higher customer conversion rates year-to-date versus last year." Defendant Coleman explained that a customer conversion happens when "you send an impression kit to a customer [and] you get it back and actually convert it to a sale." He added, "[t]hat percent going up is a big deal from a revenue perspective, but also a profitability perspective because it drives cost of customer acquisition way down. So that's one thing and we've seen a really nice improvement." On this conference call, Frank also averred that adoption of the Byte app has led to "a significant improvement in Net Promoter Scores at the point of treatment completion."

101.    On February 29, 2024, Dentsply filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2023. In the 10-K, the Company again said that Byte "contracts with an expansive nationwide network of independent licensed dentists and orthodontists for the provision of clinical services, including the oversight and control of each

customer's clinical treatment in order to comply with these regulations and ensure that the business does not violate rules pertaining to the corporate practice of dentistry."

102.    The statements set forth *supra* were materially false and misleading, and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In fact, Byte aligners had been causing major injuries to patients since at least May 2021, as revealed in backlogged injury reports that the Company filed with the FDA over the course of 2024. At least part of the problem was that customer service employees and overseeing dentists were incentivized to enroll contraindicated patients who had other dental issues which should have made them ineligible for Byte treatment. As a result, Defendants' positive statements regarding Byte's customer experience, and the expansive network of dentists overseeing and controlling each customer's treatment, were materially misleading and/or lacked a reasonable basis. Additionally, Dentsply concealed the fact that its high conversion rates were due to sales incentives to enroll contraindicated patients.

**The Truth Emerges**

103.    Investors began to learn the truth on October 24, 2024, after the market closed, when Dentsply issued a press release, which was also filed with the SEC on Form 8-K (the "October 24 8-K"), stating that, in a decision "made in consultation with the FDA," it was suspending the sale and marketing of Byte Aligner System and Impression Kits. Dentsply also stated that it "expects to record non-cash charges for the impairment of goodwill within the range of $450 - $550 million."

104.    The next day, Dentsply conducted a conference call (the "October 25 Conference Call") with analysts and investors to talk about the Byte business update. During that call, Defendant Campion talked about the decision to withdraw Byte Aligners from the market, stating

40

that "in connection with our ongoing discussions with FDA, we have determined that our patient onboarding workflow may not provide adequate assurance that certain . . . contraindicated patients do not enter treatment with Byte Aligners." Campion also said, "[f]rom a macro perspective, the state regulatory environment has adversely impacted our Byte Aligner business model. As a result, we've seen declining conversion rates and new documentation records and additional requirements, such as evidence of visits to a dentist or patient x-rays."

105.     Even while revealing this news, Dentsply misrepresented its severity. For instance, in the October 24 8-K, Dentsply initially described the suspension of sales and marketing of Byte Aligners as a "precautionary measure" that would only last "while the Company conducts a review of certain regulatory requirements." Then, on the October 25 Conference Call, Campion averred that "Dentsply Sirona holds itself to the highest standards of quality and compliance with patient safety at the center of everything we do" and that "[c]onsistent with that commitment, we have proactively taken steps to continuously improve our post-market surveillance processes. One way, we do this is through the company's operating model, which includes retrospective analysis and reporting."

106.     Analysts viewed the news of the sales and marketing suspension as negative, but Defendants' misleading assurances lessened the impact of those disclosures. For example, an analyst at Leerink Partners wrote, "[i]t is never a 'good' news day when a company has to pull a product from the market. But in the grand scheme of potential events for XRAY, we think that the overall dynamic of today's Byte news and generally decent pre-announcement (vs. very low expectations) isn't necessarily terrible." An analyst at Evercore ISI believed that "FY24 EPS may fall ~4-6c below our current estimate of $1.96."

107.    As a result of these disclosures, the price of Dentsply common stock dropped $1.10 per share, or 4.5%, from a closing price of $24.41 per share on October 24, 2024, to a closing price of $23.31 per share on October 25, 2024.

108.    Before the markets opened on November 7, 2024, Dentsply reported its financial results for the third quarter of 2024. The Company announced a revised outlook for 2024 of "adjusted EPS of $1.82 to $1.86 (previously $1.96 to $2.02)" and an "impairment of goodwill of ($495) million net of tax" to the Orthodontic and Implant Solutions segment, which includes Byte. Dentsply explained that it was revising its 2024 outlook "due to market pressures impacting U.S. equipment, legislative changes affecting the direct-to-consumer aligner business model, and the voluntary suspension of sales, marketing, and shipments of Byte Aligners and Impression Kits." The Company explained that "[t]he outlook does not include potential adjustments or impacts of additional Byte remediation measures or decisions made by the Company."

109.    Dentsply conducted an earnings call later that day, where senior executives further discussed the third quarter results. Defendant Campion explained that even before the suspension of sales, "[r]educed conversion rates for Byte drove a sequential double-digit decline." Defendant Coleman said that "Byte, our direct-to-consumer aligner brand, declined 7% year-over-year and 19% sequentially, primarily due to lower conversion rates and other adverse impacts from legislative challenges in certain states." Campion also cast doubts on Dentsply's long-term prospects, stating "I think the obvious question many of you will have surrounds our original $3 adjusted EPS target for 2026. Clearly, the macro and other pressures, like Byte, have created significant hurdles to achieving this target."

110.    Defendant Campion also talked about the future of Byte on this conference call. He said that the Company was "not at a point in our analysis to make a definitive decision concerning

Byte and we are thoroughly evaluating strategic options, which may include a discontinuation of some or all of [this] business." In response to a question on how long the suspension might last, Campion responded that the Company had already "taken very fast action on the cost side" and "informed the . . . relevant employees that their jobs will be ceasing to exist." Later in the call, an analyst asked if Campion's response meant that Byte Aligners would be permanently off the market, stating "I mean, effectively, it sounds like you're telling us you're just shutting down the business without just saying you're shutting down the business."

111.    The market was astonished. "Tough day," wrote an analyst for Evercore ISI. The analyst continued, "[t]oday's update to both shorter-term dynamics in the channel and the 2025 financial implications from the Byte suspension (which we are assuming will be permanent), have complicated the outlook for XRAY." An analyst at Leerink Partners wrote that "[u]knowns [are] piling up" and that Leerink's "previous view had been that the company has numerous levers to sustain profit growth. With ongoing growth challenges, the Byte suspension (we have removed Byte from our model for now), and what remains a choppy market, we find it hard to remain constructive until we see better data points." An analyst for Piper Sandler wrote that the day's news regarding Dentsply had analysts asking, "'is this the bottom?' or 'will it get worse?'".

112.    As a result of these disclosures, the price of Dentsply common stock dropped $6.72 per share, or more than 28%, from a closing price of $23.98 per share on November 6, 2024, to a closing price of $17.26 per share on November 7, 2024.

## DAMAGES TO DENTSPLY

113.    As a direct and proximate result of the Director and Officer Defendants' bad acts, Dentsply has lost and spent, and will continue to lose and spend, many millions of dollars.

114.    Such expenditures include, but are not limited to, legal fees, costs, and any

payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

115.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against Dentsply or the Director and Officer Defendants based on the bad acts alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

116.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against Dentsply due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

117.    Further, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Director and Officer Defendants who breached their fiduciary duties to Dentsply.

118.    As a direct and proximate result of the Director and Officer Defendants' behavior, Dentsply has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will hinder the Company's stock in the future due to the Company's misrepresentations and the Director and Officer Defendants' breaches of fiduciary duties and unjust enrichment.

## DENTSPLY ISSUES FALSE AND MISLEADING PROXY STATEMENTS

119.    In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statements issued on April 14, 2023 (the "2023

Proxy") and on April 10, 2024 (the "2024 Proxy") (collectively, the "Proxies"), that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

120.    The Director Defendants drafted, approved, reviewed, and/or signed the Proxies before they were filed with the SEC and disseminated to Dentsply's stockholders. The Director Defendants negligently issued materially misleading statements in the Proxies. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxies allegations and related claims.

121.    In support of re-electing themselves, Defendants Brandt, Campion, Deese, Holden, Hosein, Kraemer, Lucier, Mazelsky, Varon, Vergis, and Wenzel highlighted their supposed oversight of the Company in the 2023 Proxy. The 2023 Proxy stated:

*Risk Oversight*

The Board oversees the management of risks inherent in the operation of our businesses and the implementation of our strategic plan. In this regard, the Board seeks to understand and oversee the most critical risks relating to the Company's business, allocate responsibilities for the oversight of risks among the full Board and its committees, and see that management has in place effective systems and processes for managing risks facing the Company. Risks falling within this area include but are not limited to general business and industry risks, operating risks, business continuity risks, ESG risks, cyber-security risks, financial risks including infrastructure, talent management and human capital and workforce related risks and compliance and regulatory risks. Overseeing risk is an ongoing process and is inherently tied to our operations and overall strategy. Accordingly, the Board considers risk throughout the year and with respect to specific proposed actions. While the Board oversees risk, our management is charged with identifying and managing risk. The Company has robust internal processes to identify and manage risks and to communicate information about risk to the Board. Risk management is not allocated to a single risk management officer within the Company, but rather is administered by management in an approach that is designed to ensure that the most

significant risks to the Company, on a consolidated basis, are being managed and monitored appropriately. This process includes:

- identifying the material risks that the Company may face;

- establishing and assessing processes for managing those risks;

- determining the Company's risk appetite and mitigation strategies and responsibilities; and

- making regular reports to the Board on management's assessment of exposure to risk and steps management has taken to monitor and manage such exposure.

The Board implements its risk oversight function both as a whole and through delegation to the Board committees. Specifically, the Audit and Finance Committee, pursuant to its charter, regularly assesses and discusses with management the Company's major enterprise risk exposures and the steps that have been taken to monitor and control such exposures. The Audit and Finance Committee and the other committees meet regularly and report back to the full Board. The Corporate Governance and Nominating Committee is responsible for overseeing management of risks related to our environmental and governance practices, and coordinates with the Human Resources Committee on overseeing management of risks related to our social practices. The full Board regularly reviews reports from management on various aspects of our business, including related risks and tactics and strategies for addressing them. At least annually, the Board reviews our Chief Executive Officer succession planning. In performing these functions, each committee has full access to management, as well as the ability to engage advisors. See "The Board of Directors and its Committees" above for more information regarding the roles and responsibilities of the Board committees.

The Board and the Audit and Finance Committee, pursuant to its Charter, oversee the Company's management of cybersecurity risk. The Audit and Finance Committee regularly briefs the full Board on these matters, and the full Board and the Audit and Finance Committee receive updates multiple times throughout the year and ad-hoc briefings from the Chief Information Officer on the Company's cybersecurity program, including information about cyber risk management governance and the status of projects to strengthen cybersecurity controls

Also, the Company's leadership structure, discussed in "Leadership Structure of the Board of Directors" above, supports the risk oversight function of the Board. In addition, independent directors chair the Board committees involved with risk oversight and there is open communication between senior management and directors.

122.    In support of re-electing themselves, Defendants Campion, Deese, Gladden, Holden, Hosein, Lucier, Mazelsky, Varon, Vergis, and Wenzel highlighted their supposed oversight of the Company in the 2024 Proxy. The 2024 Proxy stated:

*Risk Oversight*

The Board oversees the management of risks inherent in the operation of our businesses and the implementation of our strategic plan. In this regard, the Board seeks to understand and oversee the most critical risks relating to the Company's business, allocate responsibilities for the oversight of risks among the full Board and its committees, and see that management has in place effective systems and processes for managing risks facing the Company. Risks falling within this area include, but are not limited to, general business and industry risks, operating risks, business continuity risks, ESG risks, cybersecurity risks, financial risks including infrastructure, talent management and human capital and workforce related risks and compliance and regulatory risks. Overseeing risk is an ongoing process and is inherently tied to our operations and overall strategy. Accordingly, the Board considers risk throughout the year and with respect to specific proposed actions. While the Board oversees risk, our management is charged with identifying and managing risk. The Company has robust internal processes to identify and manage risks and to communicate information about risk to the Board. Risk management is not allocated to a single risk management officer within the Company, but rather is administered by management in an approach that is designed to ensure that the most significant risks to the Company, on a consolidated basis, are being managed and monitored appropriately. This process includes:

- identifying the material risks that the Company may face;

- establishing and assessing processes for managing those risks;

- determining the Company's risk appetite and mitigation strategies and responsibilities; and

- making regular reports to the Board on management's assessment of exposure to risk and steps management has taken to monitor and manage such exposure.

The Board implements its risk oversight function both as a whole and through delegation to the Board committees. Specifically, the Audit and Finance Committee, pursuant to its charter, regularly assesses and discusses with management the Company's major enterprise risk exposures and the steps that have been taken to monitor and control such exposures. The Audit and Finance Committee and the other committees meet regularly and report back to the full Board. The Corporate Governance and Nominating Committee is responsible for

overseeing management of risks related to our environmental and governance practices, and it coordinates with the Human Resources Committee on overseeing management of risks related to our social practices. The full Board regularly reviews reports from management on various aspects of our business, including related risks and tactics and strategies for addressing them. At least annually, the Board reviews our Chief Executive Officer succession planning. In performing these functions, each committee has full access to management, as well as the ability to engage advisors. See "The Board of Directors and its Committees" above for more information regarding the roles and responsibilities of the Board committees.

The Board and the Audit and Finance Committee, pursuant to its Charter, oversee the Company's management of cybersecurity risk. The Audit and Finance Committee regularly briefs the full Board on these matters, and the full Board and the Audit and Finance Committee receive regular updates multiple times throughout the year and ad-hoc briefings on the Company's cybersecurity program, including information about cybersecurity risk management governance and the status of projects to strengthen cybersecurity controls. Additionally, in October 2023, the Company appointed Ricardo F. Johnson to assume the newly created role of Chief Information Security Officer ("CISO"), which is responsible for enhancing, maintaining, modernizing and evolving the Company's global cyber framework. Mr. Johnson has more than 20 years of experience in building mission critical programs that support national security supply chains, and embedding hardware security, critical medical technologies, and cyber defenses for federal & banking systems.

With oversight from our Board of Directors, the Company has also formally adopted and annually updates a Security Incident Response Plan which coordinates the activities we take to prepare for, detect, respond to and recover from cybersecurity incidents. These include processes to triage, assess severity of, escalate, contain, investigate, and remediate the incident, as well as to comply with potentially applicable legal obligations and mitigate brand and reputational damage. Our incident response plan establishes a framework for measuring the severity of security incidents and provides for a post-market response program including protocols for coordination and communication between security response teams, designated leaders within the Company, internal and outside legal counsel, and the Audit and Finance Committee in responding to any such incidents.

Also, the Company's leadership structure, discussed in "Leadership Structure of the Board of Directors" above, supports the risk oversight function of the Board. In addition, independent directors chair the Board committees involved with risk oversight and there is open communication between senior management and directors.

123.    The Proxies thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning Byte's customer experience, the expansive network of dentists overseeing and controlling each customer's treatment, and the impact of sales incentives on conversion rates.

124.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

## DERIVATIVE ALLEGATIONS

125.    Plaintiff brings this action derivatively in the right and for the benefit of Dentsply to redress injuries suffered by Dentsply as a direct result of the Defendants' breaches of fiduciary duty. Dentsply is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

126.    Plaintiff will adequately and fairly represent the interests of Dentsply in enforcing and prosecuting the Company's rights.

127.    Plaintiff was a stockholder of Dentsply at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Dentsply stockholder.

## DEMAND FUTILITY ALLEGATIONS

128.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth above as though fully set forth herein.

129.    The Dentsply Board currently has 11 members, nine of whom are Defendants in this action: Campion, Lucier, Deese, Gladden, Holden, Hosein, Mazelsky, Varon, and Vergis.

130.    Plaintiff has not made any demand on Dentsply's current Board to institute this action against the Director and Officer Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

### A.    The Director and Officer Defendants Lack Independence Because They Face a Substantial Likelihood of Liability

131.    The Director and Officer Defendants face a substantial likelihood of liability for their individual misconduct. As alleged *supra*, the Director and Officer Defendants breached their fiduciary duties by allowing the Company to issue the materially false and misleading statements described *supra*. The Director and Officer Defendants had a duty to insure that the Company's SEC filings, press releases, and other public statements and presentations regarding its business, operations, prospects, internal controls, and financial statements were accurate.

132.    In addition, the Director and Officer Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to insure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to insure that the Board's duties were being carried out in good faith and with the required diligence and due care. Instead, the Director and Officer Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed *supra* that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Dentsply.

133.    The Director and Officer Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and

appropriate steps to insure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to insure that the Board's duties were being carried out in good faith and with the required due diligence constitute breaches of fiduciary duties that have resulted in the Director and Officer Defendants facing a substantial likelihood of liability. If the Director and Officer Defendants were to bring a suit on behalf of Dentsply to recover damages sustained as a result of this misconduct, they would expose themselves and their colleagues to significant liability. For this reason, demand is futile as to the Director and Officer Defendants.

134.    Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

**B.    Defendants Gladden, Hosein, Varon, and Wenzel are not Disinterested Because They Were Members of the Audit and Finance Committee**

135.    The Audit and Finance Committee represents and assists the Board with oversight of the Company's compliance with legal and regulatory requirements, the efficacy of the Company's enterprise risk management structure and key processes, and the integrity of the financial reporting processes. One of the Audit and Finance Committee's responsibilities is to insure that the Company's financial statements, reports, and other financial information disclosed to the public complies with legal requirements. The Audit and Finance Committee was thus responsible for reviewing and approving Dentsply's press releases, conferences with investors and analysts, and Forms 10-Q and 10-K filed between December 1, 2022 and November 6, 2024. Defendants Gladden, Hosein, Varon, and Wenzel were members of the Audit and Finance Committee during the relevant time period and were thus responsible for knowingly or recklessly allowing the improper statements related to the Company's financial projections. Accordingly,

Defendants Gladden, Hosein, Varon, and Wenzel breached their fiduciary duty of loyalty and good faith because they participated in the misconduct described *supra*. They face a substantial likelihood of liability for these breaches, making any demand on them futile.

      **C.**    **The Director and Officer Defendants are not Independent**

136.    All of the Director and Officer Defendants received and most continue to receive substantial compensation for their roles as Company directors. In addition, most Director and Officer Defendants solicited the false and misleading 2024 Proxy Statement, which led to the re-election of the Director and Officer Defendants to the Board, allowing them to continue breaching their fiduciary duties to the Company. As trusted Company directors, they conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For these reasons, too, the Director and Officer Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

137.    Therefore, for all of the reasons set forth *supra*, none of the Directors can consider a demand with disinterestedness and independence. Thus, a demand upon the Board is excused as futile.

**CLAIMS FOR RELIEF**

**COUNT I**
**Breach of Fiduciary Duty**
**(Derivatively Against the Director and Officer Defendants)**

138.    Plaintiff incorporates each allegation set forth above as if fully set forth herein.

139.    Each of the Director and Officer Defendants owed and owes Dentsply the highest

obligations of loyalty, good faith, due care, and oversight.

140.    Each of the Director and Officer Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, and oversight to the Company's shareholders.

141.    As a direct and proximate result of the breaches of duty alleged herein, Dentsply has sustained and will sustain significant damages.

142.    As a result of the misconduct alleged herein, these Director and Officer Defendants are liable to the Company.

143.    Plaintiff, on behalf of Dentsply, has no adequate remedy at law.

**COUNT II**
**Unjust Enrichment**
**(Derivatively Against the Director and Officer Defendants)**

144.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

145.    By their unlawful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or compelled to be made, the Director and Officer Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

146.    The Director and Officer Defendants either benefitted financially from the improper behavior, or received bonuses, stock options, or similar compensation from Dentsply that was tied to the performance or artificially inflated valuation of Dentsply, or received compensation or other payments that were unjust in light of the Director and Officer Defendants' bad faith behavior. This includes lavish compensation, benefits, and other payments provided to the Director and Officer Defendants who breached their fiduciary duties to Dentsply.

147.    Plaintiff, as a stockholder and representative of Dentsply, seeks restitution from the Director and Officer Defendants and seeks an order from this Court disgorging all profits,

including from insider transactions, payments to the Director and Officer Defendants, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Director and Officer Defendants due to their unlawful behavior and breach of their fiduciary and contractual duties.

148.    Plaintiff has no adequate remedy at law.

**COUNT III**
**Abuse of Control**
**(Derivatively Against the Director and Officer Defendants)**

149.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

150.    The Director and Officer Defendants' bad acts alleged herein constituted an abuse of their ability to control and influence Dentsply, for which they are legally responsible.

151.    As a direct and proximate result of the Director and Officer Defendants' abuse of control, Dentsply has sustained significant damages. Due to the bad acts alleged herein, the Director and Officer Defendants are liable to the Company.

152.    Plaintiff has no adequate remedy at law.

**COUNT IV**
**Gross Mismanagement**
**(Derivatively Against the Director and Officer Defendants)**

153.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

154.    By their actions alleged herein, the Director and Officer Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to carefully managing the assets and business of Dentsply in a manner consistent with the operations of a publicly-held corporation.

155.    As a direct and proximate result of the Director and Officer Defendants' gross mismanagement and breaches of duty alleged herein, Dentsply has sustained and will continue to sustain significant damages.

156.    Due to the bad acts and breaches of duty alleged herein, the Director and Officer Defendants are liable to the Company.

157.    Plaintiff has no adequate remedy at law.

**COUNT V**
**Waste of Corporate Assets**
**(Derivatively Against the Director and Officer Defendants)**

158.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

159.    The Director and Officer Defendants compelled Dentsply to pay the Director and Officer Defendants excessive salaries and fees to the detriment of the stockholders and Dentsply.

160.    Due to the foregoing, and by failing to properly consider the interests of Dentsply and its public stockholders, the Director and Officer Defendants have compelled Dentsply to waste valuable corporate assets while Dentsply suffered from undisclosed issues. The Director and Officer Defendants' bad acts have compelled Dentsply to incur many millions of dollars of legal liability and/or costs to defend unlawful actions and investigations and the Securities Class Action, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

161.    Due to the waste of corporate assets, the Director and Officer Defendants are each liable to Dentsply.

162.    Plaintiff has no adequate remedy at law.

## COUNT VI
## Violation of Section 14(a) of the Exchange Act
## (Against The Director Defendants)

163.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

164.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

165.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxies. In the Proxies, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

166.    The Proxies, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Dentsply misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

167.    Plaintiff, on behalf of Dentsply, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper reelection of the Director Defendants to the Board.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

(a) Declaring that Plaintiff may maintain this derivative action on behalf of Dentsply and that Plaintiff is a proper and adequate representative of the Company;

(b) Declaring that demand against the Board is excused as futile;

(c) Declaring that Defendants breached their fiduciary duties and were unjustly enriched;

(d) Against all of the Defendants and in favor of Dentsply for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

(e) Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to, the institution of appropriate corporate governance measures;

(f) Awarding Dentsply restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

(g) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

(h) Granting such other and further equitable relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 18, 2025

**ROWLEY LAW PLLC**

*S/ Shane T. Rowley*

Shane T. Rowley (SR-0740)
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
Email: drl@rowleylawpllc.com

*Attorneys for Plaintiff*